1  Lauren A. Dean, Esq. (SBN 174722)
   *lauren@magdeanlaw.com*
2  MAGNANIMO DEAN LAW, APC
   5850 Canoga Ave., Suite 400
3  Woodland Hills, California 91367
   Telephone:   (818) 305-3450
4  Facsimile:    (818) 305-3451

5  Attorney for Plaintiff:
   Michael Vallieres

6

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11  MICHAEL VALLIERES, Derivatively       CASE NO.:
    on Behalf of AFFIRM HOLDINGS,
12  INC.,

13              Plaintiff,                 **VERIFIED SHAREHOLDER**
                                           **DERIVATIVE COMPLAINT**
14              v.

15
    MAX LEVCHIN, JEREMY LIEW,
16  LIBOR MICHALEK, JENNY J.
    MING, CHRISTA S. QUARLES,
17  KEITH RABOIS, JACQUELINE D.
    RESES, JAMES D. WHITE AND
18  MICHAEL LINFORD,

19              Defendants,

20              -and-

21
    AFFIRM HOLDINGS, INC.,
22
                Nominal Defendant.
23

24

25          Plaintiff Michael Vallieres, by and through his undersigned counsel, derivatively

26  on behalf of Nominal Defendant Affirm Holdings, Inc. ("Affirm" or the "Company"),

27  submit this Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's

28  allegations are based upon his personal knowledge as to himself and his own acts, and

                                        1

upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Affirm with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Affirm.

2.     The Company operates a platform for digital and mobile-first commerce in the U.S. and Canada.  The Company's platform includes point-of-sale payment solutions for consumers, merchant commerce solutions, and a consumer-focused app.  The Company offers a payment service known as "buy now, pay-later" ("BNPL"), which allows consumers to purchase a product immediately and pay for it at a later time, usually over a series of installments.  According to the Company: "[u]nlike legacy payment options and our competitors' product offerings, which charge deferred or compounding interest and unexpected costs, we disclose up-front to consumers exactly what they will owe — no hidden fees, no penalties."

3.     The Company also maintains an official Twitter account, through which it publishes statements—or "tweets"—including periodic financial results.

4.     Throughout the Relevant Period, Defendants caused the Company to make materially false and misleading statements concerning the Company's business, operations, and compliance policies.  Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) the Company's BNPL service facilitated excessive consumer debt, regulatory arbitrage, and data harvesting; (ii) the foregoing subjected the Company to a heightened risk of regulatory scrutiny and enforcement action; (iii) the Company maintained inadequate disclosure controls and procedures and internal control over financial reporting; (iv) accordingly, the Company's tweet for its second quarter 2022 financial results contained selected metrics

Verified Shareholder Derivative Complaint

that made it appear that the Company had performed better than it actually did; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

5. On December 16, 2021, the Consumer Financial Protection Bureau (the "CFPB") reported that it had launched an inquiry into the Company's BNPL payment service, along with four other companies offering BNPL. The CFPB indicated that it was concerned about how BNPL leads to "accumulating debt, regulatory arbitrage, and data harvesting," and is seeking data on the risks and benefits of the products. In a statement addressing BNPL services, the CFPB Director stated, "[t]he consumer gets the product immediately but gets the debt immediately too."

6. On this news, the Company's stock price fell $11.74 per share, or 10.58%, to close at $99.24 per share on December 16, 2021.

7. Then, at approximately 1:15 p.m. on February 10, 2022, the Company issued a tweet from its official Twitter account, wherein the Company disclosed certain metrics from its second quarter 2022 financial results. The tweet, which was published prior to the Company's planned release of its financial results, portrayed a highly successful quarter, which included an increase in revenue of 77%. This caused the Company's share price to spike nearly 10% in intra-day trading. The Company later deleted the tweet and released its full second quarter financial results ahead of schedule, which were lackluster, posting a loss of $0.57 per share, compared with analyst expectations of $0.37 per share.

8. On this news, the Company's share price plummeted from an intra-day high of $83.57 per share on February 10, 2022, to close at $58.68 per share, or approximately 32%.

## JURISDICTION

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

Plaintiff's claims also raise a federal question pertaining to the claims made in the securities class actions entitled *Toole v. Affirm Holdings, Inc., et al.*, Case 3:22-cv-01243 (N.D. Cal.) (the "Securities Class Action") based on violations of the Exchange Act.

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

12. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, the Company's principal executive offices are in this District.

## THE PARTIES

**Plaintiff**

13. Plaintiff is, and was at relevant times, a shareholder of Affirm. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation. Plaintiff currently holds Affirm shares as of the filing of this Complaint.

**Nominal Defendant**

14. **Nominal Defendant** Affirm is a Delaware corporation with principal executive offices located at 650 California Street, San Francisco, California 94108.

**Defendant Directors**

15. **Defendant Max Levchin** ("Levchin") has served as the Company's Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") at all relevant times. Defendant Levchin is also the founder of the Company.

16. **Defendant Jeremy Liew** ("Liew") has served as a member of the Company's Board since 2013. Defendant Liew has been a Partner at Lightspeed Venture Partners, a venture capital firm, since 2006. Defendant Liew is the Chair of the Compensation Committee and a member of the Nominating and Governance

Committee.

17.   ***Defendant Libor Michalek*** ("Michalek") has served as a member of the Company's Board since May 2021.  Defendant Michalek has served as the Company's President, Technology, Risk and Operations since May 2021 and previously served as the Company's President, Technology from 2018 to May 2021.  Defendant Michalek served as the Company's Chief Technology Officer from 2015 to 2018.  Prior to joining the Company, Defendant Michalek served as an Engineering Director at YouTube and Google.

18.   ***Defendant Jenny J. Ming*** ("Ming") has served as a member of the Company's Board since February 2021.  Defendant Ming is a member of the Audit Committee and a member of the Nominating and Governance Committee.

19.   ***Defendant Christa S. Quarles*** ("Quarles") has served as a member of the Company's Board since 2018.  Defendant Quarles is the Chair of the Audit Committee and a member of the Compensation Committee.

20.   ***Defendant Keith Rabois*** ("Rabois") has served as a member of the Company's Board since 2013.  Defendant Rabois has been a General Partner at Founders Fund since 2019.  Prior to joining Founders Fund, Defendant Rabois served as a Managing Director at Khosla Ventures from 2013 to 2019.  Defendant Rabois is a member of the Audit Committee.

21.   ***Defendant Jacqueline D. Reses*** ("Reses") has served as a member of the Company's Board since January 2021.  Defendant Reses is a member of the Audit Committee and the Compensation Committee.

22.   ***Defendant James D. White*** ("White") has served as a member of the Company's Board since February 2021.

23.   Defendants Levchin, Liew, Michalek, Ming, Quarles, Rabois, Reses and White are collectively referred to hereinafter as the "Director Defendants."

**Officer Defendant**

24.   ***Defendant Michael Linford*** ("Linford") has served as the Company's

1    Chief Financial Officer at all relevant times.

2        25.    The Director Defendants and Defendant Linford are collectively referred to
3    herein as the "Individual Defendants".

4                    **CODE OF BUSINESS CONDUCT AND ETHICS**

5        26.    As members of the Board, the Director Defendants were held to the highest
6    standards of honesty and integrity and charged with overseeing the Company's business
7    practices and policies and assuring the integrity of its financial and business records.

8        27.    The conduct of the Director Defendants complained of herein involves a
9    knowing and culpable violation of their obligations as directors and officers of the
10   Company, the absence of good faith on their part, and a reckless disregard for their
11   duties to the Company and its investors that the Director Defendants were aware posed a
12   risk of serious injury to the Company.

13                  **DUTIES OF THE INDIVIDUAL DEFENDANTS**

14       28.    By reason of their positions as officers and/or directors of the Company,
15   and because of their ability to control the business and corporate affairs of the Company,
16   the Individual Defendants owed Affirm and its investors the fiduciary obligations of
17   trust, loyalty, and good faith.  The obligations required the Individual Defendants to use
18   their utmost abilities to control and manage the Company in an honest and lawful
19   manner.  The Individual Defendants were and are required to act in furtherance of the
20   best interests of the Company and its investors.

21       29.    The Individual Defendants owe to Affirm and its investors the fiduciary
22   duty to exercise loyalty, good faith, and diligence in the administration of the affairs of
23   the Company and in the use and preservation of its property and assets.  In addition, as
24   officers and/or directors of a publicly held company, the Individual Defendants had a
25   duty to promptly disseminate accurate and truthful information with regard to the
26   Company's operations, finances, and financial condition, as well as present and future
27   business prospects, so that the market price of the Company's stock would be based on
28   truthful and accurate information.

30.     To discharge their duties, the officers and directors of Affirm were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Affirm were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Affirm conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

31.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Affirm, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

32.     The Individual Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, Affirm has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## THE COMPANY'S AUDIT COMMITTEE CHARTER

33.     Pursuant to the Company's Audit Committee Charter: "The purpose of the Audit Committee (the 'Committee') of the Board of Directors (the 'Board') of Affirm Holdings, Inc. (the 'Corporation') is to prepare the audit committee report required by the SEC to be included in the Corporation's annual proxy statement and to assist the Board in overseeing and monitoring: (i) the Corporation's accounting and financial reporting processes; (ii) the quality and integrity of the Corporation's financial statements and the auditing of those financial statements; (iii) compliance with legal and regulatory requirements; (iv) the Corporation's independent registered public accounting firm's qualifications and independence; (v) the performance of the Corporation's internal audit function; and (vi) the appointment, compensation, retention, oversight and performance of the Corporation's independent registered public accounting firm. The Committee shall also perform such further functions as may be consistent with this Charter or assigned by applicable law, the Corporation's certificate of incorporation or bylaws, or the Board."

34.     The following duties and responsibilities are within the authority of the Audit Committee, and the Audit Committee shall perform such duties consistent with and subject to applicable law and rules and regulations promulgated by the SEC, Nasdaq, or any other applicable regulatory authority:

**B.     Oversight of Annual Audit and Quarterly Reviews**

The Committee shall have the following duties and responsibilities with respect to the Corporation's annual audit and quarterly reviews:

(a)     Review and discuss with the Independent Auditor its annual audit plan, including the timing and scope of audit activities, and monitor such plan's progress and results during the year;

(b)     Review with management, the Independent Auditor and the leader of the Corporation's internal audit function, the following:

    (i)     all critical accounting policies and practices to be used;

    (ii)     any critical audit matters arising from the current period audit;

    (iii)     all alternative treatments of financial information that the Independent Auditor has discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Independent Auditor;

    (iv)     all other material written communications between the Independent Auditor and management, such as any management letter and any schedule of unadjusted differences; and

    (v)     any material financial arrangements of the Corporation which do not appear on the financial statements of the Corporation; and

(c)     Resolve all disagreements between the Independent Auditor and management regarding financial reporting.

**C.     Oversight of the Financial Reporting Process and Internal**

**Controls**

The Committee shall have the following duties and responsibilities with respect to the Corporation's financial reporting process and internal controls:

(a)     Review:

(i)     the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Corporation's internal audit function, through inquiry and discussions with the Independent Auditor, management and the leader of the Corporation's internal audit function; and

(ii)    if applicable, the yearly report prepared by management, and attested to by the Independent Auditor, assessing the effectiveness of the Corporation's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Corporation's Annual Report on Form 10-K;

(b)     Review periodically with the Chief Executive Officer, Chief Financial Officer and the Independent Auditor:

(i)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Corporation's ability to record, process, summarize and report financial information; and

(ii)    any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal control over financial reporting;

(c)     Discuss guidelines and policies governing the process by which senior management of the Corporation and the relevant departments of the Corporation, including the internal audit function, assess and manage the Corporation's exposure to risk, as well as the Corporation's major litigation and financial risk exposures and the

steps management has taken to monitor and control such exposures it being understood that it is the job of management to assess and manage the Corporation's exposure to risk and that the Committee's responsibility is to discuss guidelines and policies by which risk assessment is undertaken;

(d)    Provide input to management regarding the selection, review and removal of the leader of the Corporation's internal audit function;

(e)    Review with management the progress and results of all internal audit projects, and, when deemed necessary or appropriate by the Committee, assign additional internal audit projects to the leader of the Corporation's internal audit function;

(f)    Review and discuss with the Independent Auditor the results of the year-end audit of the Corporation, including any comments or recommendations of the Independent Auditor, and, based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Corporation's financial statements should be included in the Annual Report on Form 10-K; and

(g)    Review the type and presentation of information to be included in the Corporation's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Corporation to analysts and rating agencies (which review may be done generally (*e.g.*, discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Corporation may provide earnings guidance).

**D.    Miscellaneous**

The Committee shall have the following additional duties and responsibilities:

(a)    Meet periodically with the Chief Legal Officer, and outside counsel when appropriate, to review legal and regulatory matters, including

(i)      any matters that may have a material impact on the financial statements of the Corporation and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Corporation or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Corporation;

(b)      Review and approve or ratify, as appropriate, any transaction between the Corporation and any related person (as defined in Item 404 of Regulation S-K of the SEC) in accordance with the Corporation's Related Person Transactions Policy;

(c)      Prepare the audit committee report required by Item 407(d) of Regulation S-K to be included in the Corporation's annual proxy statement;

(d)      Review and approve in advance any services provided by the Independent Auditor to the Corporation's executive officers or members of their immediate family;

(e)      Review the Corporation's program to monitor compliance with the Corporation's Code of Conduct and Ethics (the "Code of Conduct"), and meet periodically with the Corporation's Chief Legal Officer to discuss compliance with the Code of Conduct […].

## SUBSTANTIVE ALLEGATIONS

## Background

35.      The Company operates a platform for digital and mobile-first commerce in the U.S. and Canada. The Company's platform includes point-of-sale payment solutions for consumers, merchant commerce solutions, and a consumer-focused app. The Company offers a BNPL payment service, which allows consumers to purchase a product immediately and pay for it at a later time, usually over a series of installments. According to the Company, "[u]nlike legacy payment options and our competitors' product offerings, which charge deferred or compounding interest and unexpected costs, we disclose up-front to consumers exactly what they will owe — no hidden fees, no

penalties."

36.     The Company also maintains an official Twitter account, through which it publishes statements—or "tweets"—including periodic financial results.

## FALSE AND MISLEADING STATEMENTS

37.     On February 12, 2021, Defendants caused the Company to issue a post-market press release reporting the Company's fiscal year 2021 second quarter results. That press release quoted Defendant Levchin, who stated that the Company's "mission has been to build honest financial products that improve lives"; that "[w]e've aligned our success with the success of both sides of the commerce ecosystem, winning when our consumers . . . win"; and that "we remain committed to empowering consumers to take control of their finances[.]"

38.     On February 17, 2021, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended December 31, 2020 (the "2Q21 Form 10-Q"):

> Affirm . . . provides consumers with a simpler, more transparent, and flexible alternative to traditional payment options.  Our mission is to deliver honest financial products that improve lives . . . .  Affirm enables consumers to confidently pay for a purchase over time . . . .
>
> . . . . Consumers get the flexibility to buy now and make simple monthly payments for their purchases and merchants see . . . an overall more satisfied customer base. Unlike legacy payment options and our competitors' product offerings, which charge deferred or compounding interest and unexpected costs, we disclose up-front to consumers exactly what they will owe — no hidden fees, no penalties.

39.     The 2Q21 Form 10-Q also stated that the Company "ha[d] developed policies and procedures designed to assist in compliance with [various federal and state consumer protection] laws and regulations[.]"

40.     Appended as exhibits to the 2Q21 Form 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Levchin and Lindford certified that the 2Q21 Form 10-Q "fully complies with the requirements of

Section 13(a) or 15(d) of the [Exchange Act] and that information contained in the [2Q21 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the issuer."

41. On May 10, 2021, Defendants caused the Company to issue a press release reporting the Company's fiscal year 2021 third quarter results. That press release quoted Defendant Levchin, who represented that "Affirm's strong third quarter results reflect continued progress toward building the most . . . transparent financial network for consumers and merchants[.]"

42. On May 17, 2021, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2021 (the "3Q21 Form 10-Q"). That filing contained substantively the same statements as referenced in ¶¶ 37-39, regarding the Company's purportedly transparent, simple, and trustworthy payment solutions for consumers, and policies and procedures designed to assist in compliance with various federal and state consumer protection laws and regulations.

43. Appended as exhibits to the 3Q21 Form 10-Q were substantively the same SOX certifications as referenced in ¶ 40, signed by Defendants Levchin and Lindford.

44. On September 9, 2021, Defendants caused the Company to issue a press release reporting its fourth quarter and fiscal year 2021 results. That press release quoted Defendant Levchin:

> The secular shift toward flexible and transparent financial products continues to accelerate.
>
> With our superior technology, Affirm is strongly positioned to build a more valuable two sided network for consumers and merchants. We remain focused on extending our leadership position with our core products, while capitalizing on our vast opportunities to empower more people with the new ones we continue to launch.

45. On September 17, 2021, Defendants caused the Company to file an annual report on Form 10-K with the SEC, reporting the Company's financial and operating

results for the quarter and fiscal year ended June 30, 2021 (the "2021 Form 10-K"). That filing contained substantively the same statements as referenced in ¶¶ 37-39, regarding the Company's purportedly transparent, simple, and trustworthy payment solutions for consumers, and policies and procedures designed to assist in compliance with various federal and state consumer protection laws and regulations.

46.    The 2021 Form 10-K also assured investors that the Company had "concluded that our disclosure controls and procedures were effective as of June 30, 2021" and that "[t]here have not been any changes in the Company's internal control over financial reporting . . . during the fourth quarter of fiscal 2021 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting, except" for certain changes that the Company had made to resolve a prior, purportedly remediated, material weakness in its internal controls.

47.    Appended as exhibits to the 2021 Form 10-K were substantively the same SOX certifications as referenced in ¶ 40, signed by Defendants Levchin and Lindford.

48.    On November 10, 2021, Defendants caused the Company to issue a press release reporting the Company's fiscal year 2022 first quarter results.  That press release quoted Defendant Levchin: "[o]ur strong quarter once again demonstrates the continued momentum across Affirm as more people embrace the transparency, flexibility and value our solutions provide[.]"

49.    The same November 10, 2021 press release also highlighted an expanded relationship with Amazon: "[c]onsumers will have the option to split the total cost of eligible purchases into monthly payments at checkout with no late or hidden fees, ever[,]" and that, "[a]s part of an amended agreement, Affirm will serve as Amazon's only third party, non credit card, [BNPL] option in the U.S."

50.    On November 15, 2021, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2021 (the "1Q22 Form 10-Q").  That filing

contained substantively the same statements as referenced in ¶¶ 37-39, regarding the Company's purportedly transparent, simple, and trustworthy payment solutions for consumers, and effective disclosure controls and procedures and internal control over financial reporting.

51.     Appended as exhibits to the 1Q22 Form 10-Q were substantively the same SOX certifications as referenced in ¶ 40, signed by Defendants Levchin and Lindford.

52.     The statements referenced in ¶¶ 37-51 were false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's BNPL service facilitated excessive consumer debt, regulatory arbitrage, and data harvesting; (ii) the foregoing subjected the Company to a heightened risk of regulatory scrutiny and enforcement action; (iii) the Company maintained inadequate disclosure controls and procedures and internal control over financial reporting; (iv) accordingly, the Company's tweet for its second quarter 2022 financial results contained selected metrics that made it appear that the Company had performed better than it actually did; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

## **THE TRUTH BEGINS TO EMERGE**

53.     On December 16, 2021, the CFPB announced that it had launched an inquiry into the Company's BNPL payment service, along with four other companies offering BNPL.  The CFPB stated:

> Today the [CFPB] issued a series of orders to five companies offering "buy now, pay later" (BNPL) credit.  The orders to collect information on the risks and benefits of these fast-growing loans went to [*inter alia*] Affirm . . . .  The CFPB is concerned about accumulating debt, regulatory arbitrage, and data harvesting in a consumer credit market already quickly changing with technology.
>
> "Buy now, pay later is the new version of the old layaway plan, but with

modern, faster twists where the consumer gets the product immediately but gets the debt immediately too," said CFPB Director Rohit Chopra. "We have ordered [*inter alia*] Affirm . . . to submit information so that we can report to the public about industry practices and risks." Buy now, pay later credit is a type of deferred payment option that generally allows the consumer to split a purchase into smaller installments, typically four or less, often with a down payment of 25 percent due at checkout. The application process is quick, involving relatively little information from the consumer, and the product often comes with no interest. Lenders have touted BNPL as a safer alternative to credit card debt, along with its ability to serve consumers with scant or subprime credit histories.

* * *

The law requires that the CFPB monitor consumer financial markets and enables the agency to require market players to submit information to inform this monitoring. The CFPB expects to publish aggregated findings on insights learned from this inquiry. Today's orders seek to illuminate the range of these consumer credit products and their underlying business practices. Specifically, the Bureau is concerned about:

- **Accumulating debt**: Whereas the old-style layaway installment loans were typically used for the occasional big purchase, people can quickly become regular users of BNPL for everyday discretionary buying, especially if they download the easy-to-use apps or install the web browser plugins. If a consumer has multiple purchases on multiple schedules with multiple companies, it may be hard to keep track of when payments are scheduled. And when there is not enough money in a consumer's bank account, this can potentially result in charges by both the consumer's bank and the BNPL provider. Because of the ease of getting these loans, consumers can end up spending more than anticipated.

- **Regulatory arbitrage**: Some BNPL companies may not be adequately evaluating what consumer protection laws apply to their products. For example, some BNPL products do not provide certain disclosures, which could be required by some laws. And while the BNPL application may look similar to a standard checkout with a credit card, protections that apply to credit cards may not apply to BNPL products. Many BNPL companies do not provide dispute resolution protections available to users of other forms of credit, like

credit cards. And finally, depending on what rules the lender is following, different late fees and policies apply.

- **Data harvesting**: BNPL lenders have access to the valuable payment histories of their customers. Some have used this collected data to create closed loop shopping apps with partner merchants, pushing specific brands and products, often geared toward younger audiences. As competitive forces pressure the merchant discount, lenders will need to find other sources of revenue to maintain growth and profitability. The Bureau would like to better understand practices around data collection, behavioral targeting, data monetization and the risks they may create for consumers.

The BNPL product has seen growth internationally and many other countries are also taking a close examination of its providers. As part of today's inquiry, the Bureau is working with its international partners in Australia, Sweden, Germany and the UK, specifically the Financial Conduct Authority. The Bureau will also be coordinating with the rest of the Federal Reserve System, as well as its state partners. [Emphasis in original].

54. On this news, the Company's stock price fell $11.74 per share, or 10.58%, to close at $99.24 per share on December 16, 2021. Despite this decline in the Company's stock price, the Company's securities continued to trade at artificially inflated prices as a result of the Company's misrepresentations concerning the strength and accuracy of its financial reporting controls.

55. For instance, the Company planned to announce its financial results for the second quarter of fiscal year 2022 after the markets closed on February 10, 2022. That day, at approximately 1:15 p.m., however, the Company's official Twitter account issued a tweet containing some of the Company's second quarter 2022 financial results (the "2Q22 Tweet"). That tweet stated: "Another great quarter in the books [] as we accelerated our growth. Leveraging our superior technology & putting people first = increasing total # of transactions by 218%, active consumers by 150%, GMV by 115%, & revenue by 77%! Tune in today at 2pm PT[.]"

56. The 2Q22 Tweet, which made it appear that the Company had a highly

successful quarter, caused the Company's share price to jump roughly 10% in intra-day trading.

57.    The statements referenced in ¶ 55 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Defendants made and/or misleading statements and/or failed to disclose that: (i) the Company maintained inadequate disclosure controls and procedures and internal control over financial reporting; (ii) accordingly, the 2Q22 Tweet for the Company's second quarter 2022 financial results contained selected metrics that made it appear that the Company had performed better than it actually did; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH FULLY EMERGES

58.    On February 10, 2022, the Company deleted the 2Q22 Tweet and released its full second quarter 2022 financial results ahead of schedule.  The full financial results were far less impressive than investors were led to believe from the 2Q22 Tweet.  For instance, the Company posted a quarterly loss of $0.57 per share—far worse than analyst expectations of $0.37 per share.

59.    The Company's 2Q22 Tweet was materially false and misleading because it contained only selected metrics from the Company's second quarter 2022 financial results, which caused investors to believe that the Company had performed better than it actually did.  The 2Q22 Tweet omitted material details, including that the Company's quarterly loss was $0.57 per share, which was necessary in order to make the statement made not misleading.

60.    It was severely reckless for Defendants to allow the misleading tweet to be sent during the market day.

61.    On news of the deleted 2Q22 Tweet and subsequent release of the full earnings, the Company's share price plummeted $24.89 per share from an intra-day high

19

of $83.57 per share to close at $58.68 per share on February 10, 2022, or approximately 32%.

62.     On January 12, 2022, the CFPB reported:

Several weeks ago, we issued a market-monitoring inquiry into "buy now, pay later" (BNPL) products and business practices. Now we are inviting anyone interested in this market to submit comments -- including families, small businesses, and international regulators.

Use of BNPL has seen astronomical growth. Companies like Affirm, Afterpay, Klarna, PayPal, and Zip (formerly Quadpay) have become almost ubiquitous in the retail market since the pandemic. This past holiday season, usage spiked even higher, especially among young people. Some analysts have suggested that BNPL has rerouted big holiday shopping money away from the credit card companies towards these companies, putting an enormous amount of consumer debt on their books.

People encounter BNPL credit at the point of sale either online or at traditional retail stores. The loans are presented as a type of deferred payment option that generally allows someone to split a purchase into smaller installment payments, often with a down payment of 25 percent. The application process is quick, involving relatively little information from the buyer, and the buyer usually pays no interest.

For the buyer, it may seem like they are getting something for nothing. And it can be appealing because not only is it convenient but instead of an upfront cost of $100, they pay $25. But we are concerned there may be some systemic, underlying problems, particularly around accumulating debt, regulatory arbitrage, and data harvesting in a consumer credit market already quickly changing with technology. For some people, BNPL could look like a standard payment method when they are really taking on a new form of debt.

While BNPL has caught the eye of many investors, including big tech companies and significant venture capitalists, it has also caught the eye of fellow regulators around the world, including ones in Ireland, Germany, and the EU. Sweden already has a BNPL law that requires merchants to first present consumer options that do not contribute to debt. Last year, Her Majesty's Treasury in the United Kingdom signaled plans for greater regulation. And in late October, the Reserve Bank of Australia said that

BNPL firms will no longer be able to bar merchants from passing on surcharges for their services.

In the U.S., Congress has tasked us with ensuring that markets for consumer financial products and services are fair, transparent, and competitive. To that end, it has authorized us to require participants in the marketplace to provide information that helps us monitor risks to consumers and to publish aggregated findings that are in the public interest. The orders issued on December 16 required five different buy now, pay later lenders to provide information on the risks and benefits of their products.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

63.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

64.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

65.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

66.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

67.     The Company Board is currently comprised of Defendants Levchin, Liew, Michalek, Ming, Quarles, Rabois, Reses and White.  Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.*, four (4), cannot exercise independent

objective judgment about whether to bring this action or whether to vigorously prosecute this action.

68.    The Individual Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its financial results and future prospects.  Because of their advisory, executive, managerial, and directorial positions with the Company, the Individual Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

69.    The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

70.    The Individual Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

71.    The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

72.    The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

73.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Individual Defendants

are unable to comply with their fiduciary duties and prosecute this action. They are in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuits brought under the Securities Exchange Act of 1934.

74.    Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Levchin**

75.    Defendant Levchin has served as the Company's Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") at all relevant times. The Company provides Defendant Levchin with his principal occupation for which he receives handsome compensation.

76.    As CEO, Defendant Levchin was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the statements contained in the 2021 Form 10-K, which he personally signed.

77.    Further, Defendant Levchin is a defendant in the Securities Class Action. For these reasons, Defendant Levchin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Michalek**

78.    Defendant Michalek has served as a member of the Company's Board since May 2021. Defendant Michalek has served as the Company's President, Technology, Risk and Operations since May 2021 and previously served as the Company's President, Technology from 2018 to May 2021. Defendant Michalek served as the Company's Chief Technology Officer from 2015 to 2018. The Company provides Defendant Michalek with his principal occupation for which he receives handsome compensation.

79.    For these reasons, Defendant Michalek is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendants Ming, Quarles, Rabois and Reses**

80. Defendants Ming, Quarles, Rabois and Reses served as members of the Audit Committee during the Relevant Period, with Defendant Quarles serving as chair. Pursuant to the Company's Audit Committee Charter, these Defendants are responsible for overseeing the Company's quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's financial reporting process, and the Company's internal controls over financial reporting. These Defendants failed to ensure the quality and integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to make and file false and misleading financial statements with the SEC and to fail to maintain internal controls. The Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Defendant Levchin and Liew -- Investors' Rights Agreement**

81. ***Defendant Levchin***, entities affiliated with Lightspeed Venture Partners (***Defendant Liew*** is partner at Lightspeed Venture Partners), entities affiliated with Spark Capital, entities affiliated with Thrive Capital, entities affiliated with Jasmine Ventures other holders of the Company's redeemable convertible preferred stock, and Shopify, are party to an amended and restated investors' rights agreement, dated as of September 11, 2020 (the "Investors' Rights Agreement"), pursuant to which the Company granted such holders certain registration rights with respect to the registrable securities held by them.

82. Both Levchin and Liew have business relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders.

## FIRST CAUSE OF ACTION

### (Against The Individual Defendants for Breach of Fiduciary Duties)

83. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

84.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

85.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

86.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

87.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

88.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against The Individual Defendants for Gross Mismanagement)

89.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

90.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a

manner consistent with the operations of a publicly held corporation.

91.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

92.     Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against The Individual Defendants for Abuse of Control)

93.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

94.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

95.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

96.     The acts and omissions of the Individual Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

## FOURTH CAUSE OF ACTION

### (Against The Individual Defendants For Unjust Enrichment)

97.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

98.     During the Relevant Period, the Individual Defendants received bonuses,

stock options, and/or similar such compensation from the Company that were tied to the financial performance of the Company.  The Individual Defendants were unjustly enriched thereby.

99.    To remedy the Individual Defendants' unjust enrichment, this Court should order them to disgorge their unjustly obtained bonuses and compensation.

100.    The acts and omissions of the Individual Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

## FIFTH CAUSE OF ACTION

### (Against Defendants Levchin and Lindford for Contribution Under Sections 10(b) and 21D of the Exchange Act)

101.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.    Affirm and Defendants Levchin and Lindford are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Levchin and Lindford's willful and/or reckless violations of their obligations as officers of Affirm

103.    Defendants Levchin and Lindford, because of their positions of control and authority as CEO and CFO, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

104.    Accordingly, Defendants Levchin and Lindford are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of

action for contribution arising out of violations of the Exchange Act.

105.   As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Levchin and Lindford.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.   Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties;

C.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 25, 2022

**MAGNANIMO DEAN LAW, APC**

By: _____

Lauren A. Dean, Esq. (SBN 174722)
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Tel: (818) 305-3450
Email: lauren@magdeanlaw.com

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGESTON**
501 Fifth Avenue, 19th Floor
New York, NY 10017
Phone: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-aw.com

***Counsel for Plaintiff***

Verified Shareholder Derivative Complaint

**VERIFICATION**

I, MICHAEL VALLIERES, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Affirm Holdings, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Affirm Holdings, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 20, 2022, at Virginia Beach, Virginia.

MICHAEL VALLIERES

1